UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

BENEDETTO ROCCHIO,                                  :

                                   Plaintiff,       :

             - against -                            :      **REPORT AND**
                                                           **RECOMMENDATION**
MICHAEL J. ASTRUE,                                  :      **TO THE HONORABLE**
Commissioner of Social Security,                           **JED S. RAKOFF**
                                                    :
                                   Defendant.              08 Civ. 3796 (JSR) (FM)
----------------------------------------------------------x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:   11/19/10 |

**FRANK MAAS**, United States Magistrate Judge.

             Plaintiff Benedetto Rocchio ("Rocchio") brings this action pursuant to

Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of

a final decision of the Commissioner of the Social Security Administration

("Commissioner") denying his application for disability insurance benefits.  The

Commissioner has moved, and Rocchio has cross-moved, for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)").  For the

reasons set forth below, I recommend that both motions be granted in part and denied in

part.

I.     Procedural History

             On July 8, 2005, Rocchio filed an application for disability insurance

benefits, claiming that his disability began nearly a decade earlier on December 6, 1995.

(See Tr. 20).[1]   Rocchio alleged that he was disabled because of diabetes, poor eyesight, a heart condition, and anxiety.  (Id. at 37, 58-65).  After the Social Security Administration ("SSA") denied Rocchio's application based on a state agency review, he requested a de novo hearing before an administrative law judge ("ALJ").  (Id. at 29, 34-37).

On June 7, 2007, ALJ Wallace Tannenbaum held a hearing, during which Rocchio was represented by David Jalosky, Esq.  (Id. at 12).  Subsequently, on July 13, 2007, the ALJ issued a decision, in which he concluded that Rocchio was not disabled within the meaning of the Act before December 31, 2000, the date his disability benefits expired.  (Id. at 12-19).  This decision became final on January 25, 2008, when the Appeals Council denied Rocchio's request for review.  (Id. at 3-6).

Rocchio timely commenced this action on April 22, 2008.  (ECF No. 2).  Thereafter, on May 9, 2008, Your Honor referred the case to me for a Report and Recommendation.  (ECF No. 4).  The Commissioner filed his answer on September 15, 2008, (ECF No. 6), followed by a motion for judgment on the pleadings pursuant to Rule 12(c) on December 5, 2008.  (ECF No. 9).  Rocchio, in turn, filed a cross-motion for judgment on the pleadings on May 5, 2009.  (ECF No. 16).  The Commissioner filed his reply on May 27, and Rocchio filed his reply on June 19, 2009.  (ECF Nos. 19, 22).  Both motions therefore are fully submitted.

---

[1]   Citations to "Tr." refer to the certified copy of the administrative record filed with the Answer.  (ECF No. 6).

2

The issues presented by the motions are (a) whether the ALJ developed the administrative record adequately, and (b) whether the ALJ's determination that Rocchio was not disabled is supported by substantial evidence.

II.    Relevant Facts

   A.    Nonmedical Evidence

Rocchio was born in Italy on January 14, 1951, and is a lawful permanent resident of the United States. (Tr. 46). After moving to this country, he graduated from high school in the Bronx in 1970. (Id. at 63, 143). He was forty-four years old on December 6, 1995, the alleged onset date of disability, and fifty-six years old at the time of the hearing before ALJ Tannenbaum.

At the hearing, Rocchio testified as follows: He is single, has no children, and lives on the first floor of a two-family home co-owned with his three brothers and sister. (Id. at 143-45). He has owned sixty percent of that home since 1979 and receives rental income from a family living upstairs. (Id. at 144, 150). He does little to maintain the upstairs apartment, but hires someone to do necessary repairs when he can afford to do so. (Id. at 145). It is his responsibility to maintain the house and take care of the related paperwork and bills. (Id. at 146).

Before December 1995, Rocchio worked as a shop foreman for a steel company that produced stainless steel tubing. (Id. at 148). For the last ten years of his employment there, he was a "quality control supervisor," who "checked the product that came off the machinery." (Id. at 149). He also supervised and trained other employees.

3

(Id.).  Rocchio agreed with the ALJ that the work he did until December 1995 was "skilled," although his original job with the company was unskilled.  (Id.).  Rocchio's foreman job ended when the company moved to Florida.  (Id. at 150).  He then received unemployment benefits for approximately six months, during which time he looked for work "that had something to do with what [he] did prior," but was not successful.  (Id.).

After Rocchio's eligibility for unemployment insurance benefits expired, he continued to seek employment "on and off."  (Id. at 152).  The sort of work he previously had undertaken was "mostly not available anymore" because suitable employers had moved to the "South and Midwest . . . and overseas."  (Id. at 153).  Indeed, the only jobs Rocchio was able to obtain after December 1995 were two part-time positions with the Pathmark supermarket chain.  (Id. at 147-48).  He first worked for Pathmark either in 1996 or 1999, when he was hired for a "maintenance" job which involved cleaning the floors.  (Id. at 147-48).  In 2004, he again worked part-time in "produce" at a different Pathmark store.[2]  (Id. at 148).  This job, too, lasted only a few weeks.[3]

---

[2]    In his disability report, Rocchio listed the years he worked at Pathmark as 1996 and 2004; his work report, however, lists earnings for 1999, but not 1996.  (Id. at 50, 59).

[3]    Rocchio stated in his disability report that the second Pathmark job ended because he "was transferred from one dep[artment] to another [and u]nable to do the job as maintenance."  (Id. at 59).  However, he told his psychotherapist that the job lasted only six days because he "doesn't like taking orders."  (Id. at 97).

4

B.      Medical Evidence

1.      Psychological Symptoms and Treatment

On February 16, 1999, Rocchio was seen at Counseling and Psychotherapy, Inc. ("C&P"), for the first time after his primary care physician, Dr. Mark I. Rubin, referred him there because he was suffering from "anxiety and panic attacks."  (Id. at 90, 94, 106).  The therapist taking his history noted under "stressors" that Rocchio's girlfriend "argue[d] with him about stress/[anxiety]."  (Id. at 94).  The therapist also noted that Rocchio had not "[worked] in 3 [years] – could, taking care of 89 [year-old mother] – if he stays out more than 3 [hours] or after 8 she worries."  (Id.).  Rocchio told the therapist that he was constantly jumpy and anxious.  (Id.).  He also remarked that he was born with poor vision and was teased by other children due to his thick glasses.  (Id.). The therapist noted that Rocchio was a machinist by trade, but was "living off" his savings and mutual funds.  (Id.).  The therapist also recorded that Rocchio was taking Xanax[4] and had difficulty sleeping without it.  (Id. at 94-95).  The therapist further indicated that Rocchio did not trust his own perceptions and had low self-esteem.  (Id. at 95).

The next notes from a C&P mental health provider were prepared in October 1999.  (Id. at 96).  During a visit on October 4, 1999, a therapist prescribed

_____

[4]      Xanax is the brand name for alprazolam, a tranquilizer used in the treatment of mild to moderate anxiety.  MedlinePlus Medical Dictionary, http://www.nlm.nih.gov/ medlineplus/mplusdictionary.html (last accessed Nov. 18, 2010).

Celexa[5] for Rocchio.  (Id.).  The therapist noted further that Rocchio was taking Xanax,

"and since then – he hasn't had panic attacks – no problem sleeping – some

hopelessness."  (Id. at 97).  The therapist also wrote, "[Patient] is friendly – slightly

overweight . . . lives alone – spends time on the computer – had a job for . . . 6 days but

left – he doesn't like taking orders."  (Id.).  That therapist concluded that Rocchio had no

appetite problem and "no formal thought disorder," although he was sometimes tearful

and experienced apathy.  (Id.).

     During Rocchio's next visit on October 18, 1999, a therapist noted that

Rocchio had a history of addiction, which gave rise to a "need to be careful."  (Id. at 96).

Notwithstanding that concern, Rocchio's Celexa and Xanax prescriptions were renewed.

(See id. at 96, 99).  The therapist also noted that Rocchio was taking Vasotec for

hypertension and Prilosec for acidity.  (Id.).  When the therapist described the symptoms

of panic attacks, Rocchio responded, "Yeah – that's what I have."  (Id.).

     On November 17, 1999, the therapist observed, "[patient] doing well on

Celexa 20 mg a day and Aprazolam [Xanax] . . . [patient] really responded well!!"  (Id. at

96).  The therapist similarly indicated on December 15, 1999 that Rocchio was "doing

well on Celexa [and] Aprazolam."  (Id.).  On January 19, 2000, the therapist noted that

Rocchio was "feeling well;" and on February 16, 2000, the therapist wrote, "No job.

Feeling OK."  (Id.).  Although the entries for early 2000 are mostly illegible and

---

     [5]    Celexa is the brand name for citalopram, an antidepressant.  MedlinePlus Medical
Dictionary, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last accessed Nov. 18,
2010).

incompletely copied, it appears that C&P prescribed Serzone[6] for Rocchio on May 17,

2000.  (Id. at 96, 99).

        In October 2000, Rocchio began seeing Chika Okpalanma, a psychiatrist at

C&P.  (Id. at 90, 98).  During their initial meeting on October 21, 2000, Dr. Okpalanma

noted that Rocchio was unemployed, but not on public assistance and "self-employed."

(Id. at 90).  Dr. Okpalanma further observed that Rocchio:

> says he has been with [C&P] since 5/99.  He was referred by
> Dr. Rubin . . . due to "anxiety and panic attacks."  The panic
> attacks he says present at night with sudden onset of
> palpitation, restlessness, fear of dying or going crazy,
> shortness of breath, diaphoresis[7] and apprehension.  Duration
> of episode is 1½ [hours].  Says Dr. Rubin did physical
> examination EKG and no pathology was found.  Frequency of
> attacks = 1-2 annually.

(Id.).  Dr. Okpalanma also noted that Rocchio had hypertension and was taking Vasotec.[8]

(Id.)  Dr. Okpalanma concluded that Rocchio's mood was good and his affect

appropriate, with good insight and judgment.  (Id. at 91).  The doctor noted the absence of

delirium, auditory or visual hallucinations, and homicidal or suicidal thoughts.  (Id.).

Finally, he observed that Rocchio's impulse control was good.  (Id.).

------------------

[6]       Serzone is the brand name for nefazodone, an antidepressant.  See Serzone,
www.drugs.com/serzone (last visited Nov. 18, 2010).

[7]       Diaphoresis is a medical term for perspiration.  Dorland's Illustrated Medical
Dictionary 516 (31st ed. 2007) ("Dorland's").

[8]       Vasotec is the brand name for enalapril, an antihypertensive drug.  See
MedlinePlus Medical Dictionary, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html
(last accessed Nov. 18, 2010).

Dr. Okpalanma diagnosed Rocchio as follows:  Axis I, "Panic Disorder without Agoraphobia;" Axis II, "Depression;" and Axis III, "Hypertension."  (Id.).  Under his entry for a "Plan," Dr. Okpalanma noted that Rocchio understood the risks and benefits of Xanax.  (Id.).  He gave Rocchio a prescription for one milligram of Xanax to be taken orally twice a day for thirty days.  (Id.).  He decreased Rocchio's Serzone prescription to one hundred milligrams to be taken at bedtime because Rocchio said that "any dose makes him sedated."  (Id.).  Dr. Okpalanma also refilled Rocchio's Celexa prescription.  (Id.).

On November 18, 2000, Dr. Okpalanma commented that Rocchio was "doing fine and presents no complaints."  He also noted that Rocchio had two Serzone and Celexa refills remaining and wanted to continue on those drugs.  Dr. Okpalanma refilled Rocchio's prescriptions and observed that Rocchio denied any suicidal or homicidal thoughts or auditory or visual hallucinations.  This apparently was Rocchio's last visit before the end of 2000 because Dr. Okpalanma was on vacation in December. (Id. at 93).

There are records of nine further visits by Rocchio to Dr. Okpalanma in 2001, during which the doctor generally concluded that Rocchio was doing well and refilled his medications.  (Id. at 92, 93).

Finally, on September 12, 2005, at the request of the SSA, M. Morog, Ph.D., conducted a review of Rocchio's psychiatric records for the period from December 6, 1995, through December 31, 2000.  (Id. at 120).  Dr. Morog concluded that there was

8

insufficient evidence of any anxiety-related disorders to conclude that Rocchio was disabled.  (Id.).

    2.   <u>Vision Impairments</u>

Rocchio first saw Dr. Jay I. Lippman, an ophthalmologist, in or around October 1995.  (Id. at 136, 139).  During Rocchio's initial visit, Dr. Lippman took Rocchio's history.  The doctor noted that Rocchio had undergone a cataract extraction thirty years earlier in Italy, that his last eye exam was six years earlier, and that he was wearing contact lenses which were four to five years old and "very uncomfortable."  (Id. at 136).  Rocchio indicated that he was interested in obtaining new contact lenses and eyeglasses.  (Id.).  Dr. Lippman's notes suggest that Rocchio also may have been interested in secondary intraocular lenses ("IOLs").[9]  (Id.).  Rocchio's family history was noted to be negative for glaucoma.  (Id.).  He was diagnosed with nystagmus[10] and status post aspiration of cataracts.  (Id.).

On October 16, 1995, Dr. Lippman repositioned Rocchio's existing IOLs. (Id. at 124).  Thereafter, on October 20, 1995, Rocchio's uncorrected visual acuity was 20/100 in his left eye.[11]  (Id.).  On October 31, 1995, Rocchio visited Dr. Lippman, noting

---

[9]    An intraocular lens is "a lens often made of silicone or an acrylic polymer that may be doubled over for implantation into the eye following cataract removal."  <u>See</u> http://www.medilexicon.com/medicaldictionary.php (last accessed Nov. 18, 2010).

[10]    Nystagmus is an "involuntary, rapid, rhythmic movement of the eyeball, which may be horizontal, vertical, rotary, or mixed, i.e., of two varieties."  <u>Dorland's</u> at 1327.

[11]    Dr. Lippman wrote in his notes: "sc Va \ 20/100."  "Va" is a common abbreviation in ophthalmology for visual acuity, and "sc" indicates that the measurement is

(continued...)

that he started seeing double when his pilocarpine[12] wore off.  (Id. at 135).  Rocchio's

ocular pressure at the time was fourteen.[13]  (Id.).

On November 15, 1995, the IOL in Rocchio's left eye was repositioned at

the New York Ear and Eye Infirmary, and Dr. Lippman noted the following day that it

was in "good position."  (Id.).  On November 21, 1995, Rocchio's uncorrected left eye

acuity was 20/200.  (Id. at 134).  Despite the repositioning, Rocchio was scheduled for an

IOL exchange[14] on December 6, 1995.  (Id.).  On December 7, 1995, Dr. Lippman noted

that Rocchio was one day post-operative from his IOL exchange and that the new IOL

was in "good position."  (Id. at 133).  On December 12, 1995, Rocchio's uncorrected

---

[11](...continued)
"[w]ithout refractive correction."  See Abbreviations Commonly Used in Ophthalmology,
http://www.uiowa.edu/~c067111/pdf documents/abbreviations.pdf ("Abbreviations") (last
accessed Nov. 16, 2010).  Visual acuity typically is measured by means of a Snellen eye chart.
A visual acuity of 20/100 indicates that Rocchio needed the letters on the chart to be five times
closer, or five times larger, than usual in order to read them.  See Wendy Strouse Watt, O.D.,
How Visual Acuity is Measured, http://www.mdsupport.org/library/acuity.html (last accessed
Nov. 18, 2010).

[12]      Pilocarpine is a drug used to reduce ocular pressure.  See Pilocarpine
hyrochloride, Drugs.com, http://www.drugs.com/pdr/pilocarpine-hydrochloride.html (last
accessed Nov. 18, 2010).

[13]      Dr. Lippman's notes abbreviate ocular pressure as "Ta," which stands for
applanation tonometry, a method of measuring eye pressure.  See Abbreviations, supra note 12.
Normal eye pressure is measured in millimeters of mercury and ranges from ten to twenty-one
millimeters.  Tonometry: MedlinePlus Encyclopedia, http://www.nlm.nih.gov/medlineplus/
ency/article/003447.htm (last accessed Nov. 18, 2010).

[14]      An IOL exchange apparently is done when a problem arises with an earlier IOL
implantation.  See IOL Exchange: Principle and Practice Rates, http://bmctoday.net/crstoday/
2002/05/article.asp?f=0502_051.html (last accessed Nov. 18, 2010).  While Dr. Lippman's notes
are not entirely legible, they seem to say that Rocchio's existing left lens was not nasally aligned
to the right eye.  See id. (noting that dislocation and decentration are among the reasons why an
IOL exchange may be necessary).

visual acuity in his left eye was 20/100.  (Id. at 133).  On December 19, 1995, twelve

days after the IOL exchange, Dr. Lippman noted, "[H]appy now.  IOL in good position."

Rocchio's uncorrected vision in his left eye was 20/200.  (Id. at 132).  His ocular pressure

was sixteen.  (Id.).

       Approximately one month later, on January 16, 1996, Rocchio's corrected

vision was 20/70 in his right eye and 20/100 in his left eye.  (Id.).  His ocular pressure

was thirteen.  (Id.).  During a visit on January 30, 1996, Rocchio told Dr. Lippman "that

he [was] doing fairly well."  (Id. at 130).  At the time, Rocchio's corrected vision was

20/80 in his right eye and 20/70 in his left eye.  (Id.).  Rocchio did not see Dr. Lippman

again until October 29, 1996, when he complained that his corrective lens was "old and

uncomfortable."  (Id.).  On that date, his corrected visual acuity was 20/100 in his left eye

and 20/70 in his right eye.  (Id.).  Dr. Lippman noted that the IOL in Rocchio's left eye

was "nicely sitting."  (Id.).  He recommended a secondary IOL for Rocchio's right eye.

(Id.).

       In November 1996, Rocchio had a secondary IOL implanted in his right

eye.  On November 12, 1996, Dr. Lippman noted that Rocchio was eight days post-

operative.  At that time, Rocchio's uncorrected visual acuity in his right eye was 20/70 for

distance, but he complained of seeing double.  His near visual acuity was 20/40.  On

December 3, 1996, Rocchio visited Dr. Lippman complaining of poor near vision with his

new prescription.  His corrected visual acuity for distance was 20/70 in both eyes.  His

corrected near visual acuity with his new prescription was 20/60 in his right eye and

20/40 in his left eye.  Under his old prescription it had been 20/30 in both eyes.  Dr. Lippman noted that Rocchio preferred his older prescription even though he was aware that there was not much improvement.  (Id. at 129).

On February 18, 1997, Dr. Lippman noted that Rocchio's IOLs were in place.  Rocchio's corrected vision was 20/70 in both eyes.  His ocular pressure was twenty in his right eye and seventeen in his left eye.  Rocchio's next visit was on August 22, 1997.  On that date, his corrected visual acuity for distance was 20/80 in his right eye and 20/60 in his left eye.  His near visual acuity was 20/40.  Dr. Lippman also noted the presence of nystagmus and that his IOLs were in place.  Rocchio's ocular pressure was seventeen in his right eye and nineteen in his left eye.  (Id. at 128).

On November 23, 1998, Rocchio visited Dr. Lippman complaining of occasional discomfort in both eyes that felt "like a stretching feeling."  (Id. at 127).  Rocchio's corrected visual acuity for distance was 20/70 in both eyes, and his near vision was 20/30.  (Id.).  His ocular pressure in both eyes was sixteen.  (Id.).  Dr. Lippman noted the presence of nystagmus and secondary IOLs in both eyes, and described Rocchio as "functioning."  (Id.).  On December 10, 1999, Dr. Lippman examined Rocchio and took a medical history.  (Id. at 126).  He noted secondary IOLs in both eyes, nystagmus, and a medical history of stomach, blood pressure, and anxiety problems.  (Id.).  Rocchio's corrected visual acuity for distance was 20/70 in his right eye and 20/200 in his left eye.  His near visual acuity was 20/30 in both eyes.  (Id.).  Rocchio's pupils were noted to be irregular, and he apparently was complaining of itchiness.  (Id.).

12

The record includes additional notes from Dr. Lippman in May 2001 and October 2005 containing similar information.  (Id. at 122, 125).

In 2007, Dr. Lippman submitted a letter to the Appeals Council on Rocchio's behalf.  (Id. at 139).  Dr. Lippman stated that he had known and treated Rocchio for the past twelve years, during which time Rocchio had "rather significant congenital nystagmus and visual limitation."  (Id.).  He noted that, despite the placement of secondary IOLs in both eyes, Rocchio's vision was "quite limited," with a most recent "best corrected" vision of 20/70 in his right eye and 20/100 in his left eye.  (Id.).  Dr. Lippman further opined that Rocchio's "rather significant nystagmus precludes a normal vision" and that Rocchio had refractive amblyopia.[15]  (Id.).  The doctor noted that a fundus examination appeared normal,[16] "with the caveat that a good view is not possible because of [Rocchio's] nystagmus."  (Id.).  Finally, Dr. Lippman recommended a finding of disability, stating: "Mr. Rocchio has severe visual limitation due to his congenital nystagmus; refractive amblyopia.  The issue of disability seems clear to my mind.  This patient deserves a favorable decision on your part."  (Id.).

In response to a request by the state agency for medical advice concerning Rocchio's visual field tests, Dr. Ronald Gauthier, a consulting physician, noted on

---

[15]    Amblyopia, commonly called "lazy eye," causes the loss of one's ability to see details.  See MedlinePlus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/ article/001014.htm (last accessed Nov. 18, 2010).

[16]    The fundus is the part of the eye opposite the pupil.  See MedlinePlus Medical Dictionary, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last accessed Nov. 18, 2010).

November 15, 2005, that an entry on Dr. Lippman's records, dated October 7, 2005, described a "normal dilated fundoscopic exam, which means there was no associated retinal problem." (Id. at 33, 137). As Dr. Gauthier explained, "[w]ith no retinal disease, there would be no expected loss of visual fields." (Id. at 137). Dr. Gauthier acknowledged Rocchio's visual problems, but opined further that "the record is not consistent with any retinal disease that would cause a decrease in visual fields." (Id.).

            3.      Other Medical Records

        As Rocchio concedes, the records of his primary care physician, Dr. Mark Rubin, are almost entirely illegible. (See ECF No. 17 ("Rocchio Mem.") at 13). Of the records submitted by Dr. Rubin, only three entries in the progress notes were made during the relevant period. (Tr. 115). The only legible portions of the first such entry, dated September 15, 1999, reflect Rocchio's weight (204 pounds) and an "impression" of "substance abuse" with no elaboration. (Id.). On the next entry, dated October 4, 1999, the only legible writing relates to Rocchio's weight (205 pounds). (Id.). Finally, an entry probably dated January 26, 2000, contains the single legible word "edema."[17] (Id. at 114).

        The remainder of Dr. Rubin's handwritten records span the period from 2001 through 2005, but are illegible. (Id. at 111-14).

---

        [17]      Edema is the "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues." Dorland's at 600.

The record also contains the results of several tests conducted after the relevant period.  First, during a cardiac exam by Dr. Hal N. Klestzick on October 14, 2002, Rocchio was able to perform nine minutes and twenty-four seconds of a standard Bruce protocol[18] before stopping his treadmill stress test due to "generalized fatigue." (Id. at 100-03).  Rocchio experienced some chest discomfort during the test, but was able to reach eighty percent of the predicted heart rate for his age with an appropriate blood pressure response and no cardiac arrhythmias.  (Id. at 102).  Post-stress, his left ventricular effusion rate was forty-six percent.  (Id.).  SPECT imaging disclosed moderate global hypokinesis[19] and that the inferior wall of his heart was severely hypokinetic.  (Id. at 103).  His perfusion scans were consistent with normal myocardial perfusion scans, although the cardiologist also noted signs of a non-Q-wave inferior and lateral myocardial infarction.[20]  (Id.).

A chest x-ray from 2004 showed some calcification over his right fifth rib, but no signs of congestive heart failure or acute disease.  (Id. at 110).  The radiologist, Dr. Ronald Schliftman, also noted that there was "no significant change since a prior study

---

[18]     The Bruce protocol has seven stages, each lasting three minutes, resulting in a total of twenty-one minutes of exercise.  The speed and incline of the treadmill increase at each successive stage.  Jonathan Hill & Adam Timmis, ABC of Clinical Electrocardiography: Exercise Tolerance Testing, 324 British Med. J. 1084, 1084 (available at http://www.ncbi.nlm. nih.gov/pmc/articles/PMC1123032) (last accessed Nov. 18, 2010).

[19]     Hypokinesis, or hypokinesia, refers to "abnormally decreased mobility . . . motor function or activity."  Dorland's at 915.

[20]     A myocardial infarction is "commonly referred to as a 'heart attack.'"  Legg v. Astrue, No. 06 Civ. 0167, 2008 WL 2323403, at *4 n.4 (W.D.N.Y. June 2, 2008).

dated 12/23/98." (Id.).  The results of the chest x-ray are accompanied by a cover sheet

from Dr. Rubin to Rocchio, which stated that the results of Rocchio's recent chest x-ray

"look[] fine," and suggested that he see Dr. Rubin "in the office if the symptoms

continue." (Id. at 106).

### 4.    Rocchio's Testimony

Rocchio testified at the hearing that he wore glasses, did some reading, and

watched television "on and off." (Id. at 153).  When the ALJ inquired whether his visual

problem was totally disabling, Rocchio did not respond directly.  Instead, he testified

about having worn "coke-bottle" thick glasses until he switched to contact lenses in 1989.

(Id. at 151-52).  This was the only testimony that Rocchio gave regarding his vision

difficulties.

The ALJ also asked Rocchio whether there was "any particular reason why

at the present time [he] was unable to work on a sustained basis in the national economy."

(Id. at 153).  Rocchio responded that he was "having a hard time just walking a couple of

blocks," a difficulty he attributed to his "heart problem." (Id.).  Rocchio said that his

primary care physician referred him to a cardiologist because he "wasn't able to do what

[he] used to be able to do." (Id. at 154).  Rocchio testified that he then underwent certain

tests which disclosed that he had suffered a "silent heart attack." (Id.).  Rocchio agreed

with the ALJ's statement that the heart problem had developed in or around 2001 or 2002,

but also noted that he could not remember the exact date. (Id. at 153-54).  He further

explained that he was referred to Columbia Presbyterian Hospital, where a catheterization

was performed, revealing that his "veins were clogged" and that one was "90 percent blocked."  (Id. at 154).[21]

　　　　　When asked about his anxiety problems, Rocchio stated that he began to have panic attacks after his father passed away on December 26, 1996.  (Id. at 155).  As he explained, "I started gradually getting panic attacks, and if you know anything about panic attacks, you don't want them on your worst enemy."  (Id.).  When the ALJ asked him which year the panic attacks started, Rocchio said "maybe '97, the summer of '97." (Id.).  Rocchio said that he went to his primary care physician "when the panic attack really got bad," i.e., when "it lasted a couple of days."  (Id. at 156).   Rocchio stated that his primary care physician prescribed Xanax.  (Id. at 156-57).  Rocchio added that he also was prescribed Celexa for anxiety.  (Id. at 158).  Eventually, Rocchio's physician suggested that he see a therapist named Mark Jenningsburg.[22]  (Id. at 157).  When the ALJ suggested that Rocchio first saw a therapist in 1999, Rocchio conceded, "That's probably true."  (Id.).  Rocchio confirmed that the therapist had prescribed psychotropic drugs, and that his panic attacks remained under control as long as he did not forget to take his medication.  (Id. at 157-58).  When the ALJ asked if he was able to "deal with"

---

[21]　　　There are no documents relating to the cardiac catherization in the record, which is consistent with the ALJ's suggestion that the procedure was performed after the end of the insured period.  (See Tr. 153).

[22]　　　The record indicates that this is the transcriber's phonetic rendering of the name. (Id.).

his anxiety if he takes his medication, Rocchio responded, "[u]p to a point." (<u>Id.</u> at 158).[23]

C.    <u>Prior Disability Application</u>

Rocchio previously applied for Disability Insurance Benefits in 1997, but his request was denied in September of that year. (<u>Id.</u> at 42-45). On July 18, 2005, only ten days after Rocchio filed his present application, a disability analyst named "Stein" evidently requested the folder concerning the earlier denial "to assist in adjudicating [Rocchio's] current claim." (<u>Id.</u> at 45). The record is silent as to whether this folder ever was sent.

D.    <u>ALJ Decision and Appeal</u>

On July 13, 2007, ALJ Tannenbaum issued a decision in which he concluded that Rocchio was not disabled during the relevant period. (<u>Id.</u> at 19). In his decision, the ALJ first considered Rocchio's insured status, and then engaged in the five-step sequential analysis required by 20 C.F.R. § 404.1520. (<u>Id.</u> at 14-19).

The ALJ found that Rocchio had acquired sufficient quarters of coverage to remain insured through December 31, 2000, which was his date last insured. (<u>Id.</u> at 12).

---

[23]    As part of his application, Rocchio provided an extensive list of his medications. He indicated that he was taking (or had taken) Xanax for panic attacks, Ecotrin as a blood thinner, Zyrtec for allergies, Nexium for acid reflux, cozaar and metroprolol for his heart, Norvasc for high blood pressure, Lipitor for high cholesterol, and GlipizideER for Type II diabetes. (<u>Id.</u> at 138). Of these, the only medications he indicated were prescribed before December 31, 2000, were Xanax and Celexa. (<u>Id.</u>).

He noted further that Rocchio had to establish that he had a disability on or before that date in order to be entitled to benefits.  (Id.).

Turning to the disability analysis, at Step One, ALJ Tannenbaum determined that Rocchio had not engaged in substantial gainful activity since the alleged onset of disability.  (Id. at 14).

At Step Two, the ALJ observed that Rocchio suffered from panic and mood disorders, a vision disorder, a cardiac disorder, and diabetes mellitus, all of which could be considered severe.[24]  (Id. at 15).  Noting the "paucity of medical evidence of impairments during the time period at issue," the ALJ then proceeded to outline the limited medical records available for his review.  (Id.).

The ALJ noted that the record contained progress notes from Dr. Rubin, Rocchio's primary care physician, but that only three of his notes pertained to the relevant time period, and that they provided only "limited information," relating to Rocchio's weight, complaints of lower back pain,[25] and prior substance abuse.  (Id.).

Turning to Rocchio's vision problems, the ALJ found that Rocchio had a history of congenital cataracts which were extracted when he was in his teens.  The ALJ also noted that Rocchio had implanted lenses, which were repositioned in November

---

[24]    Rocchio does not contend that the ALJ failed to develop the record with respect to his diabetes mellitus.  Accordingly, I do not consider it further in this Report and Recommendation.

[25]    The ALJ apparently was able to decipher more of Dr. Rubin's notes than I could. I see no reference to lower back pain.

1995.  The ALJ further stated that Rocchio had been diagnosed with nystagmus in 2001, but had no hypertensive retinopathy.  He also noted that Rocchio had no history of treatment for glaucoma.  Additionally, the ALJ discussed the state agency medical consultant's comments indicating that Rocchio has no retinal problem, "no expected loss of vision field," and no diagnosis of, or treatment for, glaucoma.  (Id.).  Finally, the ALJ observed that the record did not "include any comprehensive eye examination which would confirm that the claimant is legally blind, as he alleges."  (Id.).

With respect to Rocchio's alleged panic attacks and mood disorders, the ALJ noted that from about May 1999 to August 2000, Rocchio was treated by a psychiatrist and psychotherapist at the recommendation of Dr. Rubin.[26]  (Id.).  The ALJ observed that Dr. Okpalanma had diagnosed Rocchio as having a Mood Disorder NOS (Not Otherwise Specified) and Panic Disorder without agoraphobia, which manifested themselves in anxiety and panic attacks occurring once or twice a year.  (Id.).  The ALJ further indicated that Dr. Rubin had ruled out any physical causes for these symptoms. (Id.).  Additionally, the ALJ found that Rocchio had been prescribed Celexa, and other psychotropic medications, and that the records from mid-1999 indicated that he had responded well to these medications.  (Id. at 16).  The ALJ also noted that Rocchio did not have any delusions, hallucinations, paranoid thoughts, or suicidal or homicidal ideation.  (Id.).  The ALJ further noted that Dr. Okpalanma had "provided no analysis of

---

[26]    The ALJ's dates do not appear to be accurate.  Rocchio's first visit to C&P was in February 1999 and his visits extended through at least September 2001.  (Tr. 92, 94).

the severity of the claimant's mental disorders or the functional limitations they caused at the time." (Id.).  Finally, the ALJ found that the last entry by Dr. Okpalanma in the record was from October 2000, and that there was no further evidence in the record of psychological disorders or treatment.  (Id.).

ALJ Tannenbaum also noted that Rocchio alleged that he had suffered a myocardial infarction, a claim which was supported solely by the report of a stress test performed in 2002.  The ALJ observed that the general findings of the stress test were negative, although Rocchio reported some chest discomfort during the test.  The ALJ further found that there was no evidence of ischemia,[27] and no other medical evidence in the record concerning Rocchio's alleged cardiac condition.  (Id.).

Finally, the ALJ noted that Rocchio had listed as his medications alprazolam, Celexa, Cozaar, Ecotrin, Glipizide, Lipitor, Metropolol, Nexius, Norvasc, and Zyrtec, but that the record contained a start date for only two of those drugs, and little or no information about the others.  (Id.).

At Step Three of the analysis, ALJ Tannenbaum found that Rocchio's medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 ("Appendix 1").  He stated, "[t]he signs and symptoms of the claimant's impairments, both physical and mental, do

---

[27]     Ischemia is a "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel." Dorland's at 975.

not meet or equal the severity required by the relevant listings," but he did not provide any further analysis.  (Id.).

At Step Four of the sequential process, ALJ Tannenbaum assessed Rocchio's residual functional capacity ("RFC") to perform the requirements of his past relevant work.  (Id. at 16-17).  The ALJ concluded that through the date last insured, Rocchio had the RFC to perform physical work activities comparable to a wide range of medium work and to perform the basic mental activities of work.  (Id. at 16).  He further concluded that Rocchio's past relevant work as a shop foreman and quality control person did not require the performance of work-related activities precluded by his RFC.  (Id. at 18).  The ALJ found that there was nothing in the limited medical evidence for the relevant period which indicated that Rocchio could not stand or walk for six hours per day, lift up to fifty pounds and twenty five pounds frequently, and perform the mental activities required by competitive, remunerative work on a consistent basis.  (Id. at 17).  The ALJ also found that there was no medical evidence to support findings that Rocchio had more than a mild limitation in activities of daily living, social functioning, concentration, persistence, or pace, nor did Rocchio have any documented episodes of decompensation.  (Id.).

The ALJ further found that Rocchio's medically determinable impairments could reasonably have been expected to produce the symptoms he alleged, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible."  (Id.).  The ALJ noted that Rocchio had a thirty-year history

of vision problems and alleged that he was legally blind, but that there was "no evidence to confirm this designation." (Id.).  Indeed, the ALJ pointed out that Rocchio's ophthalmologist had stated in 1996 that Rocchio was doing "fairly well." (Id.).  The ALJ also noted that Rocchio had reported complaints of lower back pain, and was in psychotherapy for feelings of depression and anxiety attacks, but that other psychiatric symptoms were not detailed in the evidence.  (Id.).

Turning to the opinion evidence, the ALJ noted that none of Rocchio's treating sources offered opinions as to the severity of his physical or mental impairments during the relevant time period, and that they did not indicate any functional limitations with respect to Rocchio's ability to perform mental or physical work-related activities. (Id. at 18).  The ALJ also stated that there were "no examining consultative reports in the record," but that the sources on which the State Agency relied had concluded that Rocchio was not disabled during the time period in question.  (Id.).  The ALJ noted that, "[a]ccording to SSR 96-6p, findings by State Agency sources are to be considered as expert opinion evidence of non-examining sources," and that those findings with respect to Rocchio were consistent with the record and would be accorded persuasive weight. (Id.).

Finally, the ALJ found that the functional requirements of Rocchio's past relevant work were comparable to those for "medium work," i.e., standing or walking for six hours per day, occasionally lifting and carrying up to fifty pounds, and frequently lifting or carrying up to twenty-five pounds.  (Id.).  Comparing Rocchio's RFC as of his

date last insured with the physical and mental demands of such work, the ALJ found "that there is no medical evidence to support a finding that the claimant was unable to perform his past relevant work as it was actually performed from December 6, 1995 to December 31, 2000." (Id.).  Accordingly, the ALJ denied Rocchio's claim without reaching Step Five of the sequential analysis.  (Id. at 18-19).

III.    Applicable Law

A.    Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather, when the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

B.      Duty to Develop the Record and the Treating Physician Rule

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [a court] must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). Indeed, an ALJ's failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case. Id. at 114-15. An ALJ thus has an affirmative duty to develop the administrative record before making a determination regarding a disability claim. Perez, 77 F.3d at 47. Although the duty to develop the record fully is heightened when a claimant is proceeding pro se, the ALJ has a duty to do so even when a claimant, such as Rocchio, has counsel. Id.; Miller v. Barnhart, 03 Civ. 2072 (MBM), 2004 WL 2434972, at *7 (S.D.N.Y. Nov. 1, 2004). This duty may require the ALJ to seek additional information from a treating physician, including the doctor's impression of the claimant's disability claim. Miller, 2004 WL 2434972, at *6-7.

25

The ALJ's duty to develop the record "works in tandem with the so-called 'treating physician rule,' which requires the ALJ to give controlling weight to the opinion of a claimant's treating physician if the opinion is well supported by medical findings and is not inconsistent with other substantial evidence."  Rosado v. Barnhart, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. § 416.927(d)(2)).  Nonetheless, the Commissioner need not grant "controlling weight" to a treating physician's opinion as to the ultimate issue of disability, as this decision lies exclusively with the Commissioner. See 20 C.F.R. § 404.1527(e)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("treating physician's statement that the claimant is disabled cannot itself be determinative").  The Commissioner must, however, always provide "good reasons" for the weight, if any, he gives to a treating source's opinion.  20 C.F.R. § 404.1527(d)(2). The "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand," even when the opinion goes to the issue of disability.  Snell, 177 F.3d at 133-34 (citing Schaal, 134 F.3d at 505).

Because of the considerable weight ordinarily accorded to the opinions of treating physicians, an ALJ's duty to develop the record on this issue is "all the more important."  Miller, 2004 WL 2434972, at *7; see also Rosado, 290 F. Supp. 2d at 438 (quoting Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)) ("To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of a examining physician who sees the claimant once and who performs the

same tests and studies as the treating physician.").  Therefore, while a "treating

physician's statement that the claimant is disabled cannot itself be determinative[,] . . .

failure to develop conflicting medical evidence from a treating physician is legal error

requiring remand."  Miller, 2004 WL 2434972, at *8 (citing Snell, 177 F.3d at 133, and

Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)).

 C. Disability Determination

  The term "disability" is defined in the Act as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 416(i)(1)(A).  "[W]hether a claimant is disabled or unable to work is a matter reserved

for the Commissioner."  Rodriguez v. Astrue, No. 02 Civ. 1488 (BSJ) (FM), 2009 WL

1619637, at *16 (S.D.N.Y. May 15, 2009) (citing 20 C.F.R. § 404.1527(e)).  In

determining whether a claimant is disabled, the Commissioner is required to apply the

five-step sequential process set forth in 20 C.F.R. § 404.1520.  The Second Circuit has

described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not,
> the [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant
> suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner]

27

> will consider him disabled without considering vocational
> factors such as age, education, and work experience . . .
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he has the residual functional capacity to perform
> his past work.  Finally, if the claimant is unable to perform his
> past work, the [Commissioner] then determines whether there
> is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

The claimant bears the burden of proof with respect to the first four steps of

the process.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the

Commissioner finds that a claimant is disabled (or not disabled) at an early step in the

process, he is not required to proceed with any further analysis.  20 C.F.R.

§ 404.1520(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).  However, if the

analysis reaches the fifth step, the burden shifts to the Commissioner to show that the

claimant is capable of performing other work.  DeChirico, 134 F.3d at 1180.

In assessing whether a claimant has a disability, the factors to be considered

include: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such

facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s];

and (4) the claimant's educational background, age, and work experience."  Rivera v.

Harris, 623 F.2d 212, 216 (2d Cir. 1980) (internal citations omitted).

IV.     Application of Law to Facts

        The issues before the Court are whether the ALJ developed the record adequately and whether substantial evidence exists to support the ALJ's findings. Rocchio claims, in that regard, that the ALJ's decision was improper because the ALJ failed to (a) secure medical evidence from Rocchio's earlier disability application, (b) develop evidence regarding Rocchio's visual impairment, (c) order a consultative exam to assess Rocchio's psychiatric limitations, or (d) seek a medical opinion to ascertain whether Rocchio's "silent heart attack" predated his date last insured.  (Rocchio Mem. at 20-22, 24).  The Commissioner disputes these assertions and maintains that substantial evidence supported the decision that Rocchio was not disabled.  (ECF No. 10 at 8).

        A.      Alleged Failure to Develop the Record

                1.      Rocchio's Previous Social Security Disability Application

        Rocchio's first assignment of error is that the ALJ failed to secure the medical evidence from Rocchio's prior application for disability benefits, which was denied in 1997.  (Rocchio Mem. at 20).  The record indicates that a disability analyst requested this claim folder on July 18, 2005, shortly after Rocchio filed his renewed application for disability benefits.  (See Tr. 45, 54).  While it is unclear whether the folder ever was supplied to the ALJ, even if it was not, there is no reason to believe that this constitutes a breach of the ALJ's duty to develop the record fully.

        Failing to secure the prior folder would be consistent with the SSA's "HALLEX Manual," which guides its employees, but does not have the force of agency

regulations.  See Doherty v. Astrue, No. 07 Civ. 954, 2009 WL 1605360, at *8 (N.D.N.Y.

June 5, 2009).  The HALLEX Manual provides that an ALJ is not required to obtain a

claimant's prior claim file when, as here, "[a]t least four years have elapsed between the

date of the prior notice of initial determination and the date of the new application."  Soc.

Sec. Admin. Office of Hr'gs and Appeals, HALLEX: Hearings, Appeals and Lit. Law

Manual, I-2-1-10 (D)(3) (September 2005).  Rocchio's prior application was denied in

1997, which was nearly eight years before his current application.  Accordingly, the

SSA's internal guidelines did not mandate retrieval of the file.

In DeChirico, the Second Circuit observed that the HALLEX Manual

guideline does not alter an ALJ's duty to develop the record.  134 F.3d at 1184.

Nevertheless, the Circuit concluded that the ALJ in that case did not abuse his discretion

by failing to requisition or subpoena the claimant's prior application sua sponte because

the claimant was represented by counsel, his impairment was not in dispute, and

counsel's only proffer regarding the relevance of the prior application that they sought to

subpoena was that the file "may be useful to the present case."  Id.

Here, as in DeChirico, Rocchio was represented by counsel at the hearing,

the parties agree that Rocchio suffers from "severe impairments," and Rocchio's claim of

relevance is simply that the folder may be useful in challenging the ALJ's decision.  (See

Rocchio Mem. at 20).  However, any suggestion that the medical information in the prior

folder would provide a further basis for Rocchio's current disability claim is sheer

speculation, especially in light of the fact that the 1997 claim was denied.  It follows that

30

the ALJ's failure to obtain and consider the 1997 application folder does not require the remand of this case.  See Puglisi v. Astrue, No. 07 Civ. 628, 2008 WL 4371353, at *3 (W.D.N.Y. Sept. 17, 2008) (ALJ's failure to obtain medical evidence underlying claimant's prior applications for benefits was irrelevant because claimant was represented by counsel and HALLEX Manual provides that the prior claim file is not necessary); see also Morillo, 150 F. Supp. 2d at 545 (claimant's ability to produce evidence contradicting the ALJ's findings does not warrant reversal if the ALJ's findings are supported by substantial evidence).

2. <u>Rocchio's Visual Impairment</u>

Rocchio next contends that the ALJ did not accord sufficient deference to Dr. Lippman's opinion that Rocchio was disabled because of his "rather significant congenital nystagmus," and in the course of doing so, failed to develop the record fully. (Rocchio Mem. at 21-22; see also ECF No. 22 ("Rocchio Reply Mem.") at 3-4).

In his decision crediting the opinion of Dr. Gauthier, a state agency non-examining expert, rather than Dr. Lippman, Rocchio's treating ophthalmologist, ALJ Tannenbaum explained that "for the period from December 6, 1995 to December 31, 2000, none of [Rocchio]'s treating sources, offered opinions as to the severity of [Rocchio]'s impairments <u>at that time</u>, either physical or mental, and these physicians did not indicate functional limitations related to the ability to perform mental or physical work-related activities."  (Tr. 18) (emphasis added).  The ALJ also cited SSR 96-6p, 1996 WL 374180 (July 2, 1996).  (Id.).  That Social Security Ruling states that a state agency

31

medical consultant's opinion "may be entitled to greater weight than a treating source's medical opinion," in "appropriate circumstances," such as when the "consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than was available to the . . . treating source."  SSR 96-6p, 1996 WL 374180, at *3.

Here, however, it is undisputed that Rocchio's treating physician, Dr. Lippman, provided extensive care over a lengthy period.  Moreover, Dr. Lippman did not expressly say when Rocchio's alleged visual disability first manifested itself.  In these circumstances, although Dr. Lippman first stated that Rocchio was disabled some twelve years after he began to treat him, that alone cannot be considered dispositive.

Indeed, in Shaw, the ALJ rejected the treating physician's conclusion that the claimant was disabled because he had not examined the claimant for more than three years before the date last insured.  221 F.3d at 130-31.  Thereafter, the district court concluded that the ALJ properly chose to give the treating physician's opinion minimal weight because his "observations of [the claimant]'s disability were too remote in time to be dispositive."  Id. at 133.  The Second Circuit rejected this reasoning, however, explaining that the physician "had treated plaintiff for at least seven years and had made medical observations far more extensive than those of any other consulting physician."  Id. at 134.  The court also found it significant that "the record contain[ed] no indication that [the physician's] observations were unsupported by medical evidence or that his

32

opinion is inconsistent with the record as a whole," noting that "the bulk of the record . . . [was] drawn exclusively from [his] medical assessments." Id.

The plaintiff in Shaw also relied upon the opinion of a radiologist who stated that x-rays of the plaintiff taken after his date last insured showed that he might have a "deteriorating problem" in his spine. Id. at 133. The district judge refused to give any weight to this opinion, however, reasoning that it did not constitute a "true retrospective diagnosis." Id. (emphasis in original). On appeal, the Second Circuit noted that it was unclear why the radiologist's diagnosis was discounted since the record did not already contain "ample evidence of the claimant's condition [during] the relevant time period." Id. (citing Pratts v. Chater, 94 F.3d 34, 36 (2d Cir. 1996)).

In this case, Dr. Lippman had treated Rocchio for twelve years, his observations of Rocchio's visual impairment were far more detailed than any opinion provided by Dr. Gauthier, and the bulk of the evidence in the record regarding Rocchio's visual impairment came from Dr. Lippman's file concerning Rocchio's visits to his office. (See Tr. 122-36, 139). As in Shaw, neither the fact that Dr. Lippman's opinion failed to state expressly that Rocchio was disabled during the relevant time period, nor the fact that his opinion was retrospective, was a sufficient reason to disregard his opinion in its entirety.

In sum, the contradictions between Dr. Lippman's opinion and Dr. Gauthier's consultative findings obligated ALJ Tannenbaum to develop the record further with respect to Rocchio's visual impairments. See Shaw, 221 F.3d at 134; Almonte v.

33

Califano, 490 F. Supp. 127, 130 (S.D.N.Y. 1980) ("[W]here there is conflicting medical evidence it is incumbent upon the [ALJ], as well as a reviewing court, to test the quality of the medical evidence submitted in an effort to determine an individual's true medical condition.").  The case therefore should be remanded, insofar as Rocchio claims a visual disability, to allow the ALJ to develop the record further as to whether Rocchio's "rather significant nystagmus" rendered him disabled prior to December 31, 2000.

   3. <u>Psychiatric Limitations</u>

   Rocchio also alleges that the ALJ failed to investigate adequately the extent of Rocchio's psychological symptoms because he did not request a consultative examination by a psychiatrist (preferably Dr. Okpalanma) and failed to advise Rocchio that a statement or report from Dr. Okpalanma would be helpful in ascertaining the nature and severity of his condition.  (Rocchio Mem. at 22-23).

   The C&P records reflect more than fifteen sessions that Rocchio had with Dr. Okpalanma or other C&P therapists as well as the medication that Rocchio was prescribed.  (Tr. 89-99).  These records clearly establish that Rocchio was suffering from a "panic" or "anxiety" disorder.  (<u>Id.</u>).  However, nothing in the C&P records or the hearing transcript suggests that Rocchio ever suffered from a mental or emotional disorder severe enough to be disabling.  In fact, the C&P notes frequently observe that Rocchio had "[n]o complaints," (<u>id.</u> at 92), was "doing well" (<u>id.</u> at 92, 93, 96), was "doing ok" (<u>id.</u> at 93), was "fine" (<u>id.</u>), and was "feeling well" (<u>id.</u> at 96).  Accordingly, because Rocchio's psychological records are complete and indicate that his panic attacks

were under control with the assistance of psychotherapy and medication, there would

have been no reason for the ALJ to request a consultative evaluation or to suggest that

Rocchio obtain a further opinion from Dr. Okpalanma.  See 20 C.F.R. § 416.919a(b)

(requiring a consultative examination "when the evidence as a whole, both medical and

nonmedical, is not sufficient to support a decision on [the] claim").

### 4.   The "Silent Heart Attack"

Rocchio's final criticism of the hearing process relates to the ALJ's failure

to investigate fully whether Rocchio had a "silent heart attack" during the insured period.

(Rocchio Mem. at 24).  Rocchio suggests that a myocardial perfusion and gated SPECT

imaging study in 2002 indicated damage to his heart that might have occurred prior to his

date last insured.  (Id.) (citing report of Dr. Klestzick (Tr. 101-03)).  There is, however,

no reason to believe that any such damage caused Rocchio to be disabled prior to

December 31, 2000.  Indeed, the record suggests the contrary.

For example, on October 21, 2000, Rocchio reported to Dr. Okpalanma that

Dr. Rubin had performed a "physical examination and EKG" which did not result in any

finding of pathology.  (Tr. 90).  Rocchio similarly reported on February 16, 1999 that Dr.

Rubin had ordered a CAT scan, stress test, and echocardiogram after Rocchio reported

feeling "light headed," but that the results of these tests were all "WNL" i.e., within

normal limits.  (Id. at 94).  Rocchio also told a therapist that day that he could have

worked had he not been taking care of his elderly mother.  (Id.).

35

Moreover, even the stress test report in late 2002, upon which Rocchio relies, states that Rocchio's perfusion scans "were consistent with normal myocardial perfusion scans," and that he had achieved a heart rate which was eighty percent of the predicted heart rate for his age group before he stopped the stress test because of fatigue. (Id. at 103). Rocchio's blood pressure response to exercise also was appropriate. (Id.). Although the test results also indicated that the inferior wall of Rocchio's heart was "severely hypokinetic," and that his left ventricular ejection fraction was only forty-six percent, this clearly does not signify that he was disabled due to a cardiac disability during the relevant period. See Listing 4.02 (chronic heart failure) (requiring, inter alia, an ejection fraction of twenty percent or less during a period of stability).

The record further contains a radiologist's report of a chest x-ray taken in December 2004, which concluded that Rocchio showed no signs of congestive heart failure or other acute disease. Importantly, that report indicates that Rocchio had not experienced any "significant change" since the date of a prior radiological study in December 1998.[28]  (Tr. 110).

Finally, Rocchio testified at the hearing that his heart problems began in or around 2001 or 2002. (Id. at 153-54). At that time, according to Rocchio, Dr. Klestzick told him that he previously had suffered a "silent heart attack." (See id. at 154). The fact

---

[28]     Although the results from the 1998 chest x-ray are not part of the record, Rocchio has not challenged the ALJ's decision on this ground.

that Rocchio may have suffered a heart attack prior to his visit to Dr. Klestzick in October 2002 in no way suggests, however, that he was disabled prior to December 31, 2000.

In sum, because there was substantial evidence that Rocchio did not have a disabling cardiac condition prior to December 31, 2000, the ALJ did not err by failing to seek a further medical opinion as to the import of Dr. Klestzick's October 2002 report.

B.    Substantial Evidence

Although the ALJ failed to develop the record sufficiently with respect to Rocchio's nystagmus condition, Rocchio's contention that there was a duty to supplement the record concerning his alleged psychological, mood, and cardiac impairments is not a basis for remand.  Accordingly, the remaining question before the court is whether these impairments rendered him disabled prior to his date last insured.  This requires the Court to consider the ALJ's reasoning under the five-step disability analysis.

1.    First Step

The first step requires the ALJ to determine whether a claimant has engaged in substantial gainful activity during the period at issue.  20 C.F.R. § 404.1520(a)(4)(1). ALJ Tannenbaum found that Rocchio had not engaged in substantial gainful activity since the alleged onset of his disability, commenting that Rocchio's "[s]cattered earnings in 1999 and 2004 are minimal in nature and do not constitute substantial gainful activity." (Tr. 14).  This finding, which is helpful to Rocchio, is consistent with the evidence, which indicates that Rocchio had only a few hundred dollars of earnings in 1999 and 2004.  (Id. at 41).

37

2.      Second Step

At the second step of the analysis, an ALJ must assess the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is "severe" if it significantly limits the claimant's physical or mental ability to perform basic work activities.  Id. § 404.1520(c).

The ALJ concluded that Rocchio's panic, mood, and cardiac disorders were severe.  (Tr. 15).  Neither party challenges this determination.

3.      Third Step

The third step calls for the ALJ to determine whether the claimant has an impairment equal to those listed in Appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ is required to base this decision solely on the medical evidence, without regard to the claimant's age, education, or work experience.  Id. § 404.1520(d).  If the ALJ finds that the claimant has an impairment that meets or equals a listing in Appendix 1, the claimant is considered disabled within the meaning of the Act.  Id. §§ 404.1520(a)(4)(iii), (d).

a.      Psychological Symptoms

Rocchio's psychological symptoms must be evaluated under Section 12.06 of the Listings, which pertains to anxiety-related disorders.  Appendix 1 § 12.06.  To meet this listing, a claimant must demonstrate various psychological symptoms, such as persistent irrational fear (under subsection (A)(2)) or severe panic attacks occurring on average at least once a week (under subsection (A)(3)), in combination with a marked restriction of activities of daily living, marked difficulties in maintaining social

38

functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation, each of extended duration (under subsection (B)(1)-(4)), or a complete inability to function independently outside the area of one's home (under subsection (C)). Id.

The record confirms that Rocchio experienced severe panic attacks. (See Tr. 15, 89-99). However, they occurred only a few times a year, which is too infrequent to satisfy subsection 12.06(A)(3) of the Listing. Furthermore, even if Rocchio's psychological symptoms met the frequency requirement of the Listing, the record simply does not support a finding that they had effects sufficiently severe to satisfy subsections (B) or (C) of the Listing. As the ALJ correctly noted, there was no medical evidence to support a finding that Rocchio had more than a mild limitation in activities of daily living, social functioning, concentration, persistence, or pace, or that he had any episodes of decompensation. (Id. at 17). There also was no evidence that Rocchio had a complete inability to function independently outside his home. Quite to the contrary, Rocchio testified that he maintained his home, took out his own garbage, and visited family. (Id. at 144-45). His extensive psychological records similarly do not reflect any serious problems with his daily living activities. Indeed, his therapist's notes regularly noted that he was doing "fine" or "well" and that he could get a job if he did not need to care for his mother. (Id. at 93, 94, 96).

b.    <u>Mood Disorder</u>

Rocchio's alleged mood disorder must meet the requirements of Section 12.04 of the Listing relating to "Affective Disorders."  In addition to symptoms of depression, this Listing requires a claimant to satisfy the same subsection (B) requirements as Section 12.06, or to show under subsection (C) repeated episodes of decompensation or a residual disease process that would be predicted to cause decompensation if the claimant faced even a minimal increase in mental demands or change in environment.  Appendix 1 § 12.04.  There is no evidence to support a finding that Rocchio had an affective disorder of such severity.

c.    <u>Cardiac Impairment</u>

Section 4.00 of the Listings applies to Rocchio's cardiac impairment.  As noted previously, no medical evidence suggests that Rocchio had cardiac problems during the relevant period.

In sum, ALJ Tannenbaum properly concluded that none of Rocchio's impairments met or medically equaled the relevant Listings.

4.    <u>Fourth Step</u>

At the fourth step of the sequential evaluation, an ALJ must determine a claimant's RFC, <u>i.e.</u>, what the claimant can do despite his or her limitations.  20 C.F.R. § 404.1545(a)(1).  The Commissioner's RFC assessment "must address both the remaining exertional and nonexertional capacities of the individual."  SSR 96-8p, 1996 WL 374184, at *5.  "Exertional capacities refer to how a claimant's limitations and

40

physical restrictions affect the ability to perform the seven strength demands of sitting, standing, walking, lifting, carrying, pushing, and pulling." Id. "Nonexertional" capacities refer to "all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions," including postural, manipulative, visual, communicative, and mental restrictions. Id. at *6. The RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." Id. at *7; see 20 C.F.R. § 404.1529(c)(4). If the claimant still can perform past work, the ALJ must find that the claimant is not disabled. 20 C.F.R. § 404.1529(c)(4).

It was at this step that ALJ Tannenbaum concluded Rocchio was not disabled. Based on Rocchio's description of his past work as a shop foreman and supervisor in a steel manufacturing plant, the ALJ characterized Rocchio's past work as "medium work, which requires standing or walking for 6 hours a day, and lifting and carrying up to 50 lbs on occasion and 25 lbs frequently." (Tr. 18). The ALJ found "nothing in the limited medical evidence from [the relevant time period]" to conclude that Rocchio could not perform either the sort of physical work described above, or "the mental activities required by competitive, remunerative work on a consistent basis." (Id. at 17). He further determined that Rocchio's impairments produced nothing more than mild limitations in daily living activities, social functioning, concentration, persistence or pace, and that Rocchio lacked any documented episodes of decompensation. (Id.).

There is substantial evidence to support the ALJ's conclusion that Rocchio's psychological, mood, and cardiac impairments, though significant, did not strip him of the RFC to perform his past work.  As discussed above, psychotherapy and the proper medications allowed Rocchio to manage his mental and emotional ailments.  See id. at 92, 93, 96 (notes from C&P therapists commenting that Rocchio had "[n]o complaints," was "doing well," was "doing ok," was "fine," and was "feeling well."). Additionally, the only medical evidence regarding the condition of Rocchio's heart prior to his date last insured was the radiologist's report that, as of 2004, there had been "no significant change" since a prior study in 1998.  (Id. at 110).  After receiving that report, Dr. Rubin informed Rocchio that the results of the chest x-ray "look[ed] fine."  (Id. at 106).  Rocchio also admitted to a therapist in February 1999 that he could have worked had he not been taking care of his mother.  (Id. at 94).

In sum, the ALJ correctly found that Rocchio's psychological, mood, and cardiac impairments were not so severe as to render him unable to perform his past work, and, therefore, disabled.

V.     Conclusion

For the foregoing reasons, I respectfully recommend that the Commissioner's motion for judgment on the pleadings and Rocchio's cross-motion for judgment on the pleadings both be granted in part and denied in part, and that the case be remanded solely to develop the record more fully with respect to Rocchio's visual impairments.

VI.     Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Rakoff. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:      New York, New York
            November 19, 2010

_____
FRANK MAAS
United States Magistrate Judge

Copies to:

Christopher J. Bowes, Esq.
Center for Disability Advocacy Rights, Inc.
841 Broadway, Suite 605
New York, New York 10003

Susan C. Branagan
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007